**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                                     No. 99-4664

MIKE CULBERT,
Defendant-Appellee.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                     No. 99-4698

MIKE CULBERT,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Chief District Judge.
(CR-97-296-MU)

Argued: May 4, 2000

Decided: June 28, 2000

Before WIDENER, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed in part and vacated and remanded in part by unpublished
per curiam opinion. Judge Widener wrote a separate concurring and
dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Douglas Scott Broyles, Assistant United States Attorney, Kenneth Davis Bell, First Assistant United States Attorney, Charlotte, North Carolina, for Appellant. Randolph Marshall Lee, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Calloway, United States Attorney, Charlotte, North Carolina, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On October 14, 1998, a jury found Michael Culbert guilty of one count of conspiracy to possess with intent to distribute and to distribute cocaine base, in violation of 21 U.S.C.A. §§ 841(a)(1) and 846 (West 1999). After a sentencing hearing on August 24, 1999, the district court sentenced Culbert to fifty-one months in prison, to be followed by a three-year term of supervised release. The Government appeals the sentence, contending that the district court erred in attributing only three to four grams of cocaine base to Culbert and in failing to enhance Culbert's sentence for possession of a firearm. Culbert cross-appeals, arguing that the district court should have granted his motion for judgment of acquittal. We affirm Culbert's conviction, but because the district court erred in its application of the United States Sentencing Guidelines, we vacate Culbert's sentence and remand the case for resentencing.

I.

The evidence presented during the Government's case-in-chief at Culbert's jury trial revealed Culbert's involvement in a large-scale drug trafficking operation. The evidence indicated that three men, Joseph Golden, Gregory Kennedy, and Donald Hart, were longtime

2

friends involved in the drug trade in the New York/New Jersey area. Beginning in early 1996, Kennedy and Golden started traveling to Charlotte, North Carolina to visit Kennedy's aunt, Carrie Kennedy, and her live-in boyfriend, Mike Culbert. During the course of these visits, Kennedy and Golden began developing a crack cocaine trade in the Charlotte area and Culbert assisted by introducing the pair to potential customers. Soon thereafter, Kennedy and Golden were making regular round trips from the New York area, where they would pick up a supply of crack cocaine, to Charlotte, where they would sell the narcotics. In June 1996, Culbert helped Kennedy and Golden move into their own Charlotte apartment by signing a lease for them. This apartment was located at 101 Park Fairfax Drive (the Park Fairfax apartment), and, according to Kennedy, Culbert knew that this apartment would be used as a stash house for crack cocaine. Because of the large sums of money typically stored at the Park Fairfax apartment, Kennedy, Golden, and their cohorts kept multiple firearms there for protection.

In the months after moving into the Park Fairfax apartment, Kennedy and Golden continued to conduct business between the New York/New Jersey area that was the source of their drugs and the Charlotte point of distribution. The pair also enlisted the help of Hart and another longtime friend, Derek Robinson, in making the regular trips back and forth between the two locations. In Charlotte, the group would routinely conduct crack cocaine sales, in which Culbert would participate, at both the Park Fairfax apartment and Culbert's residence. Government witness Samuel Thompson testified that, at Culbert's home, he purchased as much as one kilogram of crack cocaine in a single buy, and six or seven kilograms in total. Culbert's role in deals made at his own residence usually entailed his showing buyers to a back room where Kennedy and Golden would conduct the transaction, often in Culbert's presence. The Government also presented evidence that Culbert himself would both sell and use crack cocaine that he received from Kennedy, Golden, and Hart.

On April 7, 1997, Hart was driving north out of the Charlotte area when he was stopped by George Steele, a trooper with the North Carolina Highway Patrol. After receiving Hart's consent to search the vehicle, Trooper Steele located $30,700 in cash attached to the underside of the car. This money was the proceeds of crack cocaine sales.

Evidence presented at trial indicated that $30,000 could buy well more than one kilogram of crack cocaine in New York.

On May 7, 1997, Trooper Steele conducted a traffic stop of a vehicle driven by Robinson heading south on Interstate 85 toward Charlotte. Trooper Steele again received consent to search the vehicle, and during the search he discovered 1,178 grams of crack cocaine in the trunk of the car. After his arrest, Robinson agreed to cooperate with law enforcement officials, including Federal Drug Enforcement Administration officials, to set up a controlled buy. That afternoon, Robinson called Hart at the Park Fairfax apartment and told him that his car had broken down while bringing the drugs into town. Hart agreed to meet Robinson, and upon arriving at the location of the purported break-down and conversing with Robinson, Hart was arrested. Hart then agreed to cooperate and consented to a search of the Park Fairfax apartment where he had been staying. The search of the apartment turned up multiple firearms, several rounds of ammunition, and various drug paraphernalia.

On the evening of his arrest, while in custody, Hart's pager began beeping continuously. Hart identified for DEA agent David Dongilli the names of those people who were paging him. Among the pages Hart received was a call placed from Culbert's home. Hart also agreed to make a series of recorded phone calls and was able to contact Kennedy and Golden, although calls to Culbert went unanswered. During a conversation Hart had with Kennedy while Hart was in custody at the DEA office, Kennedy informed Hart that he had just spoken with Culbert and that Hart should call Culbert.

Following the May 7, 1997 arrests of Robinson and Hart, Kennedy and Golden moved out of the Park Fairfax apartment and set up a new apartment. Out of this new apartment Kennedy and Golden continued selling crack cocaine. On November 18, 1997, Kennedy and Golden were pulled over in Baltimore County, Maryland while transporting more than a kilogram of crack cocaine to Charlotte. The two were arrested.[1]

_____

[1] Golden and Kennedy were named in the same bill of indictment as Culbert. Golden, Kennedy, and Hart entered plea agreements with the Government and testified against Culbert at his trial.

On November 24, 1997, DEA officers arrested Culbert at his home pursuant to an arrest warrant. After being advised of his rights, Culbert provided an oral statement to Agent Dongilli in which he acknowledged that he knew Kennedy and Golden and was aware that they were involved in "distributing bulk quantities of crack cocaine." (J.A. at 201.) He also disclosed that he leased the Park Fairfax apartment for them knowing that they would use it as a place to distribute crack cocaine and that he had accompanied the pair on drug deals on various occasions.

At Culbert's trial, Hart testified that, throughout the course of the drug conspiracy, the group transported an estimated fifteen kilograms of crack cocaine from the New York/New Jersey area to Charlotte. Kennedy testified that the group sold more than ten kilograms of crack cocaine in Charlotte during the conspiracy. Golden testified that they sold multiple kilograms, but he was unsure just how much.

At the close of the Government's case, Culbert's attorney orally moved for judgment of acquittal under Fed. R. Crim. P. 29, which the district court summarily denied. Culbert then testified in his own defense. In the course of his testimony, Culbert conceded that he became aware that Kennedy and Golden were involved in drug activity a few months after they moved into the Park Fairfax apartment, but he denied his own involvement. Culbert testified that no crack cocaine was sold from his house; his girlfriend, Carrie Kennedy, also testified that she knew of no such drug activity taking place. Culbert admitted that he used crack cocaine[2] but maintained that he never sold it. Culbert also claimed that Agent Dongilli mischaracterized the statement that Culbert made after his arrest and that he had not leased the Park Fairfax apartment knowing that it would be used as a place to distribute drugs.

The jury found Culbert guilty of one count of conspiring to possess with intent to distribute and to distribute cocaine base as charged in his indictment. For sentencing, Culbert's presentence report recommended that Culbert receive a base offense level of 38 because he was

_____

[2] Culbert did not testify, however, from whom in particular he purchased crack cocaine. He simply indicated that he could get it "[a] number of places," including "on the block." (J.A. at 277.)

5

responsible for more than 1.5 kilograms of cocaine base. The presentence report also recommended a two-level enhancement because Culbert was aware of the possession of firearms during the course of the conspiracy, for an overall offense level of 40, which, coupled with a criminal history category of III, carries a sentencing range of 360 months to life imprisonment under the United States Sentencing Guidelines. See U.S. Sentencing Guidelines Manual Ch. 5, Pt. A (1998). Culbert made no specific objection to the presentence report, although he continued to assert his innocence.

At Culbert's August 1999 sentencing hearing, the district court expressed reservations about the presentence report's recommendations sua sponte. The Government offered to present testimony from Agent Don Jillian in support of its position, but the district court declined to hear from Agent Jillian, noting that he would only be repeating what was already in the presentence report. The court then made the following ruling:

> I find, first of all, that the testimony regarding [Culbert's] participation in this drug conspiracy is exaggerated, much of which is unbelievable. For example, I presided at the trial, I disbelieve the testimony regarding his understanding about firearms and the level of firearms that these people are supposed to have had. I do not believe that the 2 point enhancement is necessary.
>
> I also disbelieve the quantities even though I know what's in the presentence report. The presentence report is again based entirely on the statements of Kennedy and Golden and others, all of whom have substantial interest in implicating anybody they can.
>
> The Court finds that the evidence and by its greater weight establishes that this man is chargeable with at least 3 to 4 grams of cocaine, finds that the appropriate level for sentencing is level 22 with a 51 to 63 [month range for imprisonment], this indicates that there was and the Court finds that there were small amounts of cocaine base used for personal use quantities. The Court cannot credit the volume of -- it's impossible for the quantities of money that Ken-

6

nedy and Golden testified to to pass through the hands of this man in the straightened conditions which he's lived and not leave big, big tracks. I couldn't get that kind of money without leaving big tracks. I don't think that there's anybody in this courtroom that could get that kind of money and run it through their hands without leaving any tracks. So I believe that I have dealt with it in accordance with what I understand the evidence to be and what I believe based on credibility determinations.

I, therefore, find that the offense level is a 22, criminal history category Roman Numeral III subjecting this man 51 to 63 months, and I propose to sentence him at the bottom of the guidelines reflecting the determination of Court in the credibility matters.

(J.A. at 332-33.)

After the Government sought to respond to the issues that the court raised, the following exchange took place:

THE COURT: All you've got is more hearsay.

[Government]: We have, for instance, the in excess of 1 kilo of crack that was taken off to Mr. Hart who was departing -- Mr. -- the defendant[']s.

THE COURT: You all putting up evidence against him? There's a witness that puts it in his hands[?]

[Government]: Your Honor, actually, Samuel Thompson put direct dealings with him --

THE COURT: I don't believe Samuel Thompson. I've made my credibility determination. I understand your position. . . . [A]ll I've got is a bunch of guys testifying who have nothing but incentive to hang somebody else up and I simply have resolved the credibility determination to the best of my ability and based on my presiding at the trial . . . .

7

(J.A. at 334.) The district court then sentenced Culbert to fifty-one months imprisonment, to be followed by a three-year term of supervised release.

Despite the district court's comments at Culbert's sentencing with respect to the amount of credibility given to Kennedy and Golden, the same presiding judge awarded these two men substantial-assistance downward departures at their sentencing proceedings, held five months before Culbert's. In fact, although the Government requested that Kennedy and Golden be moved down from offense level 37 to level 30 based upon their cooperation, the district court departed even further to level 27. In explaining its rationale for departing three levels below that recommended for Golden, the court stated: "I think I'm a little bit more impressed with the testimonial aspects perhaps than you said, so that's why I'm coming down a little further, and I thought he was a good witness." (J.A. at 314.)

The Government now appeals Culbert's sentence, asserting that the district court clearly erred in attributing only three to four grams of crack cocaine to Culbert and applied incorrect legal principles in deciding not to enhance his sentence for possession of firearms. Culbert cross-appeals, contending that his Rule 29 motion for judgment of acquittal should have been granted, although Culbert concedes that "[t]he error here is difficult to state." (Appellee's/Cross-Appellant's Br. at 8.)

II.

We first consider the district court's decision to attribute only three to four grams of crack cocaine to Culbert for sentencing purposes. Under the Sentencing Guidelines, a defendant convicted of conspiracy to possess with intent to distribute and to distribute crack cocaine, as Culbert was, may receive a base offense level no higher than 38. See U.S.S.G. § 2D1.1(c) (1998). This base offense level applies when 1.5 kilograms or more of cocaine base are attributable to the defendant.[3] See id. If the evidence shows that less than 1.5 kilograms of crack

_____

[3] Under the Sentencing Guidelines, an offense level of 38, coupled with a criminal history category of III, results in a sentencing range of 292 to 365 months in prison. See U.S.S.G. Ch. 5, Pt. A (1998).

8

cocaine are attributable to the defendant, the Sentencing Guidelines provide that a lower base offense level will apply. In Culbert's case, the sentencing court found that three to four grams of crack cocaine were attributable to Culbert, which, under the Sentencing Guidelines, dictates a base offense level of 22.[4] See id. We review for clear error the sentencing court's determination of how many grams of crack cocaine to attribute to Culbert. See United States v. Cook, 76 F.3d 596, 604 (4th Cir. 1996).

The Sentencing Guidelines make clear that in determining the proper base offense level to apply to a defendant involved in a crack cocaine conspiracy, a defendant is responsible for his acts, as well as "all reasonably foreseeable acts" of his co-conspirators. U.S.S.G. § 1B1.3(a)(1) (1998); see United States v. McManus, 23 F.3d 878, 885 (4th Cir. 1994). "`Accordingly, in order to attribute to a defendant for sentencing purposes the acts of others in jointly-undertaken criminal activity, those acts must have been within the scope of the defendant's agreement and must have been reasonably foreseeable to the defendant.'" Id. (quoting United States v. Gilliam, 987 F.2d 1009, 1012-13 (4th Cir. 1993)). Further, as we have indicated in the past, when a sentencing court reduces or increases a defendant's base offense level from that recommended in a presentence report, the court must provide supporting factfinding. See United States v. Goff, 907 F.2d 1441, 1445 (4th Cir. 1990).

We find the district court's factual finding that only three to four grams of cocaine base were attributable to Culbert to be baffling. The record is bereft of any evidence that Culbert bought, sold, or used an amount of crack cocaine that was only between three and four grams. To the contrary, the evidence presented at Culbert's trial indicated that substantial amounts of crack cocaine, amounts well over 1.5 kilograms, were distributed throughout the course of the conspiracy and that Culbert was well aware of the magnitude of the drugs involved in the conspiracy and was himself an active participant. Indeed, the jury found Culbert guilty of conspiracy based upon this evidence. The presentence report's recommendation was consistent with this evi-

_____

[4] A base offense level of 22 and a criminal history category of III result in a sentencing range of 51 to 63 months in prison. See U.S.S.G. Ch. 5, Pt. A (1998).

9

dence. Yet, the district court inexplicably found Culbert responsible for only three to four grams of crack cocaine.

To be sure, the sentencing court is not required to believe every witness that testified at trial; however, the court must be able to cite some evidence presented at trial that supports its factual conclusion.**5** In this case, as we have already noted, there simply was no evidence that supports the sentencing court's finding of drug quantity.**6** We, therefore, remand for resentencing. We ask the sentencing court to recalculate the amount of crack cocaine attributable to Culbert and to

_____

**5** We also note that the sentencing court did not explain why it rejected a substantial amount of the evidence linking Culbert to large quantities of crack cocaine. The court indicated that it based its finding of the amount of crack cocaine to attribute to Culbert upon its determintion that the testimony of Culbert's co-conspirators was exaggerated. In reaching its determination that only three to four grams of cocaine base were attributable to Culbert, however, the district court ignored key portions of evidence that were not at all based upon the testimony of co-conspirators. The court failed to explain why, for example, the seizure of more than one kilogram from Derek Robinson would not have been attributable to Culbert. The court also failed to explain why Agent Dongilli's testimony that Culbert admitted that he leased the Park Fairfax apartment knowing that it would be used to distribute drugs and that he was aware that Kennedy and Golden were involved in selling "bulk quantities" of crack cocaine would not require attributing a greater drug quantity to Culbert. The acceptance or rejection of this evidence was simply not contingent upon the credibility of the co-conspirators' testimony.

**6** The sentencing court indicated that it considered the testimony of Culbert's co-conspirators to have exaggerated the extent of Culbert's involvement and that it believed smaller amounts were attributable to Culbert to reflect only his personal use quantities. There was no evidence presented at trial, however, as to the amount of crack cocaine used by Culbert. Moreover, Culbert was convicted of conspiracy to possess with intent to distribute and to distribute crack cocaine; Culbert's purported use of crack cocaine was irrelevant to the offense for which he was convicted. The court's decision to attribute only personal use quantities to Culbert was thus also in conflict with the jury's verdict.

10

explain, based upon the evidence presented at trial, how it arrives at this amount.**7**

III.

We next turn to the district court's determination that Culbert should not receive a sentence enhancement for possession of firearms. Culbert's presentence report recommended imposing a two-level enhancement to Culbert's sentence under U.S.S.G.§ 2D1.1(b)(1) (1998) based upon Culbert's awareness of the possession of firearms during the course of the conspiracy. The sentencing court declined to adopt this recommendation, stating that it "disbelieve[d] the testimony regarding [Culbert's] understanding about firearms and the level of firearms that these people are supposed to have had" and that it did "not believe that the 2 point enhancement is necessary." (J.A. at 332.) We review the sentencing court's factual determinations concerning the applicability of § 2D1.1(b)(1) for clear error, while we conduct a de novo review of the sentencing court's legal interpretations of the Guidelines. See United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989).

Section 2D1.1(b)(1) of the Sentencing Guidelines calls for the imposition of a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G.§ 2D1.1(b)(1). As noted above in Part II, the Guidelines also instruct that defendants involved in jointly undertaken criminal activity will be responsible for "all reasonably foreseeable acts" of their co-conspirators. U.S.S.G. § 1B1.3(a)(1) (1998). Reading these two provisions together, we have indicated that when a defendant could reasonably foresee that a co-participant was in possession of a firearm, the two-level enhancement

---

**7** We also note that the marked inconsistencies in the sentencing court's statements made at Culbert's sentencing proceeding and those made at Kennedy's and Golden's sentencing hearings, specifically with respect to the veracity of Kennedy's and Golden's testimony, add to our reluctance to accept blindly the court's factual determinations in the absence of an adequate explanation of how it reached its conclusion. Similarly, the court's terse refusal to allow the Government to attempt to demonstrate why the presentence report's recommendation was appropriate creates further uncertainty in our minds as to the correctness of its finding.

should apply. See United States v. Kimberlin, 18 F.3d 1156, 1160 (4th Cir. 1994). We have further explained that, "`[a]bsent evidence of exceptional circumstances, . . . it [is] fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash.'" Id. (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991)) (alterations in original).

With these legal principles in mind, it is clear to us that the sentencing court operated under a faulty understanding of when the imposition of a § 2D1.1(b)(1) sentence enhancement is required. The proper question to ask in determining whether to apply this enhancement in Culbert's case is whether Culbert possessed, or could reasonably foresee a co-conspirator possessing, a firearm in the course of the conspiracy.**8** In other words, the application of the enhancement does not turn on Culbert's understanding about the possession of firearms, or the level of firearms involved, or the sentencing court's view of the necessity of applying the enhancement. Because the sentencing court's statements concerning its decision that the § 2D1.1(b)(1) enhancement was not applicable to Culbert suggest that it did not employ the proper legal standard in making this determination, we also remand this case for resentencing for a fresh look at whether to apply this enhancement consistent with the principles set forth in this opinion.

IV.

Culbert's argument as cross-appellant that the district court should have granted his Rule 29 motion for judgment of acquittal need not detain us long. As described in Part I of this opinion, the evidence overwhelmingly supported the jury's verdict convicting Culbert of conspiracy to possess with intent to distribute and to distribute crack cocaine. Culbert seems to rest his argument upon the fact that at the

_____

**8** Evidence presented at trial indicated that multiple firearms were kept at the Park Fairfax apartment throughout the course of the conspiracy, a place that Culbert leased in his name and often visited. In addition, the May 7, 1997 search of this apartment revealed the presence of at least two firearms.

12

close of evidence the district court "inform[ed] the court reporter that [it] might need a transcript, depending upon the verdict." (Appellee's/ Cross-Appellant's Br. at 9.) From this statement, Culbert infers that the district court was prepared to rule in his favor on the motion for judgment of acquittal or at least to reserve its powers to rule in his favor later on. Of course, the district court summarily denied Culbert's motion for judgment of acquittal and there is no evidence that it later reconsidered this matter.[9] Moreover, its denial of Culbert's motion was completely appropriate in light of the Government's case against him. We affirm the district court's denial of Culbert's Rule 29 motion.

V.

For the foregoing reasons, we affirm Culbert's conviction, but we vacate his sentence and remand for resentencing for a new determination of the proper amount of crack cocaine to attribute to Culbert and for further consideration of the applicability of a§ 2D1.1(b)(1) sentence enhancement for the possession of a firearm. The sentencing court shall proceed in a manner consistent with this opinion.

AFFIRMED IN PART; VACATED AND REMANDED IN PART

WIDENER, Circuit Judge, concurring and dissenting:

I concur in the affirmance of Culbert's conviction.

I respectfully dissent, however, to the vacation and remand of his sentence which was based largely, even if not wholly, on the assessment of the credibility of witnesses and weight of their testimony by the district judge, who saw the witnesses and heard them testify.

_____

[9] As even Culbert recognizes,"[t]he error here is difficult to state." (Appellee/Cross-Appellant's Br. at 8.)

13